## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| HEATHER K.R.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   Case No. 3:20-CV-00538-MAB |
| | ) |
| COMMISSIONER OF SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | |

### MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) pursuant to 42 U.S.C. § 423.[2]

### Procedural History

Plaintiff applied for DIB on September 9, 2015, alleging a disability onset date of August 31, 2015 (Tr. 23, 75, 270). Plaintiff's September 2015 application was initially denied on February 27, 2018 after a hearing was conducted in front of Administrative Law Judge ("ALJ") P.H. Jung (Tr. 117-132). Defendant's Appeals Council remanded the unfavorable decision for further evaluation on January 17, 2019 (Tr. 133-136). After

---

[1] Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. *See* Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c) (*See* Doc. 10).

holding a supplementary evidentiary hearing, ALJ Katherine Jecklin denied the application on August 27, 2019 (Tr. 18-41).   On September 23, 2019, Plaintiff filed a request for review of the hearing decision with the Appeals Counsel (Tr. 268-269). The Appeals Council denied the review on April 27, 2020, making the ALJ's decision the final agency decision subject to judicial review (Tr. 1). Plaintiff exhausted administrative remedies and filed a timely complaint with this Court.

## Issues Raised by Plaintiff

Plaintiff raises the following issue:

1. The ALJ failed to properly evaluate Plaintiff's Residual Functional Capacity ("RFC"), specifically failing to fully develop the record and support her determination that Plaintiff's lupus did not support a more restrictive RFC.

## Applicable Legal Standards

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes.[3] Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a claimant is disabled, the ALJ considers the following five

---

[3]  The statutes and regulations pertaining to DIB are found at 42 U.S.C. § 423, *et seq.*, and 20 C.F.R. pt. 404. The statutes and regulations pertaining to SSI are found at 42 U.S.C. §§ 1382 and 1382c, *et seq.*, and 20 C.F.R. pt. 416.   As is relevant to this case, the DIB and SSI statutes are identical.   Furthermore, 20 C.F.R. § 416.925 detailing medical considerations relevant to an SSI claim, relies on 20 C.F.R. Pt. 404, Subpt. P, the DIB regulations. Most citations herein are to the DIB regulations out of convenience.

questions in order: (1) Is the claimant presently unemployed? (2) Does the claimant have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform his former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. § 404.1520.

An affirmative answer at either step 3 or step 5 leads to a finding that the claimant is disabled. A negative answer at any step, other than at step 3, precludes a finding of disability. The claimant bears the burden of proof at steps 1–4. Once the claimant shows an inability to perform past work, the burden then shifts to the Commissioner to show the claimant's ability to engage in other work existing in significant numbers in the national economy. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of judicial review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Accordingly, this Court is not tasked with determining whether or not Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does *not* reweigh evidence, resolve conflicts, decide

questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## The Decision of the ALJ

The ALJ followed the five-step analytical framework described above. She determined that Plaintiff had not engaged in substantial gainful activity since August 31, 2015, Plaintiff's first onset date (Tr. 23).

Plaintiff was born on September 30, 1982 and was 32-years old on the disability onset date (Tr. 33). The ALJ found that Plaintiff had severe impairments of fibromyalgia, lupus, obesity, and bursitis of the right shoulder (Tr. 23).

The ALJ found that Plaintiff had the RFC to perform light work as defined in 20 C.F.R. §404.1567(b) with the following limitations:

> She is limited to never climbing ladders, ropes, or scaffolds, and occasional climbing of ramps and stairs, balancing, stooping, kneeling, crouching, and crawling. She is limited to frequent handling and fingering with the bilateral upper extremities, and frequent overhead reaching with the right (dominant) upper extremity. She can have no more than occasional exposure to vibration and hazards, such as unprotected heights. She can perform work limited to simple, routine, repetitive tasks involving only simple, work-related decisions and no work at a production rate pace, defined as work with an assembly line or conveyer belt.

(Tr. 27-28).

Based on the testimony of a vocational expert ("VE"), the ALJ found that Plaintiff could perform her past work as a fast food worker (Tr. 33). Ultimately, the ALJ found Plaintiff was not disabled because she was able to do both her prior work and other jobs

that exist in significant numbers in the national economy (*Id.*).

### The Evidentiary Record

The Court has reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to the points and factual allegations raised by Plaintiff.

**1.    Evidentiary Hearing**

At the time of the July 23, 2019 hearing, Plaintiff was 36-years old (Tr. 42). Plaintiff was represented by an attorney at the hearing (*Id.*). Plaintiff explained that a month prior to the hearing, she quit smoking (Tr. 56). Plaintiff testified that she received a high school diploma (Tr. 62). She lived with her husband (who works) and children (ages 15 and 18) at the time (Tr. 57). Plaintiff testified that her disabilities impact her ability to do household chores. For example, she cannot sweep or vacuum, and doing a load of laundry turns into a full-day "affair," because she has to take so many breaks (*Id.*). She testified that her husband does the dishes, but she is able to cook (with help) about three days a week (Tr. 58). Plaintiff is able to drive about once a day and that is usually to drive her son to school or pick him up (*Id.*). With that said, Plaintiff's daughter has to take her brother to school "at least a couple days a week" (Tr. 61).  Plaintiff testified that she cannot go to school events and even had to miss her daughter's graduation (Tr. 59). Bathing and dressing is difficult on some days, as is grocery shopping, and she requires her family members' assistance with these activities (*Id.*). Frequently, her daughter will go by herself to do the grocery shopping for the family (*Id.*).

The ALJ questioned Plaintiff about her prior work history, including her time as a

fast food worker (Tr. 48). Plaintiff testified that she worked as a general fast food manager, cooking and working the register, at Jack in the Box fast food restaurant from approximately 2005 to 2008 (Tr. 49-50). She then worked her way up to becoming an assistant manager around 2008 (Tr. 50). Plaintiff testified that her last job, which she was doing as of the alleged disability onset date of August 2015, was that of a general manager at Jack in the Box (Tr. 48). Plaintiff had the ability to hire and fire employees in this position (*Id.*). Plaintiff also served as a branch manager in finance and/or a loan and tax preparer (Tr. 49). In this position, Plaintiff processed loans (but did not approve or deny them), supervised other employees (but could not hire/fire), and also scheduled the employees (*Id.*).

When asked what the biggest problem is that stops her from working, Plaintiff responded with "the fatigue and pain" (Tr. 51). Plaintiff testified that if she tries to "push it," it makes the pain and fatigue worse and that naps for her are actually a requirement for her level of fatigue (*Id.*). Without twice-a-day naps that last around 1-2 hours, Plaintiff testified that her legs and hands will swell and it feels like she is walking on pins and needles (*Id.*). Plaintiff's pain is localized in her hips, knees, ankles, hands, and (as of the evidentiary hearing) in her neck (Tr. 52). While medications do not cure her pain, Plaintiff testified that they make the pain more manageable (*Id.*).

Plaintiff also discussed suffering from sinus infections, even after having sinus surgery, experiencing three to four infections post-surgery (Tr. 52). The ALJ asked Plaintiff if she had other symptoms that resulted from fibromyalgia and lupus, and Plaintiff explained she suffers from pain, fatigue, and overall soreness (Tr. 54). She

explained that sometimes it hurts to have someone touch her arm. In fact, she experiences pain even when her husband gives her a hug (*Id.*). When asked why she did not complete physical therapy, per her doctor's recommendation, Plaintiff responded that she did not believe that was one of the recommended courses of treatment for her lupus and fibromyalgia (*Id.*). Instead, Plaintiff explained that for her shoulder pain, the doctor recommended an injection, which improved the pain (Tr. 55). Plaintiff testified that she feels depressed at times (Tr. 56).

Plaintiff's attorney questioned her as well. Plaintiff testified that she is on a series of medications, including prednisone, Plaquenil, and a methotrexate injection, for her lupus (Tr. 59-60). She received the methotrexate injection every Saturday and it lasts until Tuesday, but causes severe nausea and vomiting (Tr. 60). She takes prednisone once a day and Plaquenil twice a day. Additionally, she has monthly infusions, but the infusions make her very tired (*Id.*). Plaintiff described that she has issues lifting and carrying items. For example, she needs assistance at the grocery store because the cart gets too heavy and her legs are weak (Tr. 61). On a good day, she can carry a gallon of milk, but other days she spills it and that is the heaviest item she can carry (*Id.*). Some days, her hands become so swollen from the time that it is difficult to function (*Id.*). Plaintiff was asked also about the intensity and frequency of her migraines, and explained that she experiences migraines about two to three times a week and they last anywhere from a couple of hours to a couple of days each time (Tr. 62). She experiences throbbing pain, dizziness, and nausea that, at times, causes her to vomit (*Id.*).

A VE also testified at the hearing. The VE testified that his testimony was

consistent with the DOT and if the DOT was silent on anything, the VE testified based on his experience and education (Tr. 70-71). The VE assessed Plaintiff's prior work as a branch manager (DOT number 186.167-086) as having an exertional level of light, sedentary and skilled, and a Specific Vocational Preparation ("SVP") level of 8[4], but as Plaintiff described it, the VE believed an SVP of 6[5] was more appropriate (Tr. 63). The VE assessed Plaintiff's work as a fast food general manager (DOT number 185.387-010) as having an exertional level of light and skilled with an SVP of 5[6] (*Id.*). The VE assessed plaintiff's work as a manager (DOT number 189.567-018) as having a medium exertional level (based on how Plaintiff performed it) and that although the DOT says this has an SVP of 6, the VE assessed it at a 4[7] for Plaintiff (*Id.*). As a fast food worker (DOT number 311.472-010), the VE assessed it as having a light exertional level and unskilled with an

---

[4] Specific vocational preparation, or "SVP", is the amount of time required for a typical claimant to learn the techniques, acquire the information, and develop the facility needed for average performance in a job. A claimant may acquire SVP in a school, military, institutional, or vocational environment through such settings as: vocational training, apprenticeship training, in plant training, on-the-job training, and essential experience in other jobs. For example, a registered nurse has an SVP of seven, which means that a claimant can learn this job in about 2-4 years. If the job is assessed as an SVP of 1, it means that only a short duration is needed to learn the job. In this case, an 8 means that it would take over 4 years and up to 10 years to learn the job. *See here* DI 25001.001 Medical and Vocational Quick Reference Guide, available at https://secure.ssa.gov/poms.nsf/lnx/0425001001#a7 (last accessed March 15, 2022).

[5] An SVP of 6 means that it would take over 1 year and up to 2 years to learn the job. *SEE here* DI 25001.001 Medical and Vocational Quick Reference Guide, available at https://secure.ssa.gov/poms.nsf/lnx/0425001001#a7 (last accessed March 15, 2022).

[6] An SVP of 5 means that it would take over 6 months and up to 1 year to learn the job. *SEE here* DI 25001.001 Medical and Vocational Quick Reference Guide, available at https://secure.ssa.gov/poms.nsf/lnx/0425001001#a7 (last accessed March 15, 2022).

[7] An SVP of 4 means that it would take over 3 months and up to 6 months to learn the job. *SEE here* DI 25001.001 Medical and Vocational Quick Reference Guide, available at https://secure.ssa.gov/poms.nsf/lnx/0425001001#a7 (last accessed March 15, 2022).

SVP of 2[8] (Tr. 63). The VE was questioned about a hypothetical individual with the same age (at the onset of her disability), education, and past work as Plaintiff who would have to be limited to light work and could never climb ladders, ropes, or scaffolds; could occasionally climb ramps or stairs, balance, stoop kneel, crouch, and crawl; could frequently handle or finger with the bilateral upper extremities; could frequently reach overhead with the right upper extremity; and should have no more than occasional exposure to vibration and hazards, such as unprotected heights (Tr. 64-65).

The ALJ asked the VE if this hypothetical person could complete Plaintiff's past work, and the VE responded that this person could perform all of Plaintiff's prior work as a branch manager, fast food worker, general manager, and assistant manager (Tr. 65). The ALJ then added to the hypothetical that this individual could perform work limited to simple, routine, repetitive tasks involving only simple work-related decisions, and no work at a production rate pace, which the ALJ defined as work at an assembly line or conveyer belt. The ALJ asked the VE if this person could perform Plaintiff's prior work and the VE said this person could be a fast food worker (Tr. 66). The VE explained that this hypothetical person could also work as a bagger of clothing or garments (DOT 920.687-01) which has a light exertional level and an SVP of 2 with at least 20,000 jobs in the national economy (*Id.*). Additionally, the VE explained this person could complete the work of an apparel stock checker (DOT 299.667-014), which has a light exertional level

---

[8] An SVP of 2 means that it would take no more than 1 month to learn the job. *See here* DI 25001.001 Medical and Vocational Quick Reference Guide, available at https://secure.ssa.gov/poms.nsf/lnx/0425001001#a7 (last accessed March 15, 2022).

and an SVP of 2, with 3,000 jobs in the national market. The ALJ continued, adding additional descriptions to the hypothetical, finally asking the VE that if the individual was limited to simple, routine repetitive tasks, involving only simple work-related decisions, and no work at a production rate pace, could that individual still perform Plaintiff's past work. The ALJ answered in the negative, but explained that this hypothetical person could perform the job of a toy or pillow stuffer (DOT 731.685-014) which is a sedentary job with an SVP of 2 with at least 20,000 jobs in the national market (Tr. 68). Additionally, this person could perform the job of a packer of medical supplies (DOT 559.687-014), which is a sedentary job with an SVP of 2 and 5,000 jobs nationally (*Id.*). Finally, the VE testified that this person could be a document preparer (DOT 249.587-018) with an SVP of 2 (Tr. 69).

The ALJ then asked the VE to assess the tolerance of "off task" time for these unskilled positions, which the VE estimated to be 9% of the total workday (Tr. 69-70). As for absences, these jobs would tolerate approximately three to five days a year (Tr. 70).

Plaintiff's attorney questioned the VE, and asked if the hypothetical individual needed to take extra breaks (approximately one hour per day outside of regular breaks), how that would impact the jobs, the past work, and other work. The VE testified that there would be no competitive work for that individual (Tr. 70). The VE testified that the testimony was based on the U.S. Bureau of Labor Statistics and his 41 years of experience in the field (Tr. 70).

### 3.     Relevant Medical Records

Plaintiff submitted medical records to aid the ALJ in her determination. Plaintiff

was first diagnosed with systemic lupus erythematosus ("lupus") in August 2016 by rheumatologist Dr. Rosenberg (Tr. 650). The progress notes from that August 2016 visit indicate that Plaintiff experienced symptoms of fatigue, weakness, and joint pain all over, but in particular in the thumbs, knees, and ankles that interferes with her sleep (Tr. 650). The progress notes also indicate that her symptoms are "9/10 Global" with Plaintiff having stopped working at Jack in the Box (*Id.*). Through his treatment of Plaintiff, Dr. Rosenberg recorded that Plaintiff's complains of joint pain vacillated. For example, her pain levels were, at times, at a 3 or 4 during her session and at other times, could be upwards of a 6 or 7 on a 10-point scale, with only days or weeks in between sessions (Tr. 650, 655, 677).

### 4.   Agency Forms

In a Function Report submitted on September 21, 2015, Plaintiff detailed that she has severe pain all over her body that affects her ability to function every day, including standing for long periods of time or also sitting for long periods of time (Tr. 318). She detailed that her hands are swollen when she wakes up, but she is able to care for her husband and two kids by preparing meals, helping with homework, and driving her kids to school (Tr. 319). She explains when her body is swollen and she is in pain, though, she struggles to dress herself and her husband has to help her shave (*Id.*). On good days, she can do laundry and clean the house (Tr. 320). She described going to bible study and church about twice a week back in 2015 (Tr. 322). At that time, Plaintiff was taking Gabapentin and Tramadol, and explained they impacted her by making her tired and impacting her concentration (Tr. 324). She explained that she used to be an independent

person, but due to her significant pain and forgetfulness, she is reliant on her husband for help daily (Tr. 325).

Plaintiff's husband also submitted a Function Report, dated February 3, 2016 (Tr. 352), in which he described that Plaintiff is in constant, daily pain all over her body and has issues walking and using her hands due to the pain (*Id.*). He described hat if Plaintiff's pain levels are too high, she may take the children to school, but then will spend the rest of the day in the chair or napping (Tr. 353). Prior to her illness, her husband explained that Plaintiff could work, run, play ball with the children, and grocery shop (*Id.*). He explained that she has a hard time with buttons and shoelaces, and sometimes gets unsteady when she bathes (*Id.*). He explained that she can walk about 50 ft. before needing a break to stop and rest for a minute or two before being able to walk again (Tr. 357).

### 5.   State Agency Consultants' Opinions

In connection with Plaintiff's application for benefits, the ALJ also considered evidence and opinions from prior administrative findings at Plaintiff's initial stages of applying for benefits.

For example, Defendant had Dr. Kevin Threlkeld, MD, a medical consultant employed by Defendant, review Plaintiff's medical records on November 12, 2015 (Tr. 96). Dr. Threlkeld confirmed that Plaintiff was diagnosed, at the time, with severe fibromyalgia (Tr. 91). At this time, Dr. Threlkeld noted that Plaintiff should be capable of light work, lifting up to 20 lbs. occasionally, along with standing and walking about 6 out of the 8 hours of the day (Tr. 96). Dr. Threlkeld noted that Plaintiff's X-rays were negative

and the lab work was "non-specific," while Plaintiff experienced 18/18 trigger points for pain and fatigue (*Id.*). Plaintiff's last treatment note Dr. Threlkeld cited to was dated July 23, 2015 and Dr. Threlkeld noted that there was no evidence of connective tissue disease (CDT) (Tr. 98).

On reconsideration, Defendant had Julio Pardo, MD, a medical consultant employed by Defendant, review Plaintiff's available medical records. It appears that Dr. Pardo mimicked Dr. Threlkeld's notes and agreed that Plaintiff is capable of light work (Tr. 110). This assessment is based on a last treatment note dated November 18, 2015 (Tr. 107).

## Analysis

In this appeal, Plaintiff advances one main argument in support of her contention that remand is appropriate. She asserts that the ALJ, in determining Plaintiff's RFC, failed to properly develop the record as it relates to her lupus diagnosis. In failing to develop the record appropriately, Plaintiff argues that the ALJ relied on outdated medical reports from Drs. Threlkeld and Pardo that were developed prior to Plaintiff's lupus diagnosis. Additionally, Plaintiff argues that the ALJ was required to get an expert opinion to interpret Plaintiff's lupus diagnosis, symptoms, and treatment (Doc. 27, p. 7).

Defendant argues that the ALJ's decision is supported by substantial evidence, as she based the RFC determination on the record as a whole. Defendant argues that the ALJ did acknowledge Plaintiff's lupus diagnosis by Dr. Rosenberg and how this diagnosis impacts her (Doc. 32, p. 6). Additionally, Defendant argues the ALJ analyzed Drs. Threlkeld and Pardo's opinions in conjunction with Plaintiff's lupus diagnosis, ultimately

assessing her function beyond what the state agency physicians found (Doc. 32, p. 8). Additionally, Defendant argues that Plaintiff has the burden of production and persuasion for steps one through four of the analysis, with the burden shifting to Defendant only at step five (Doc. 32, p. 8). Defendant says that Plaintiff has failed to identify any acceptable medical source that supports finding that Plaintiff had additional physical and mental functional limitations (Doc. 31, p. 10). Finally, Defendant argues that Plaintiff was represented by counsel at the hearing and did not produce an opinion for an examining medical provider that would support further or greater limitations than those found by the ALJ; therefore, Plaintiff's arguments fail and remand would be improper.

Before addressing the parties' arguments, the Court finds it necessary to briefly recount the procedural posture of this case. Plaintiff filed for disability benefits originally dating back to 2015 and was issued an unfavorable decision on February 27, 2018 (Tr. 117-132). In between her original filing date and the unfavorable decision, Plaintiff was diagnosed with lupus. The Appeals Council remanded the unfavorable decision to an ALJ for further evaluation to determine whether Plaintiff's lupus meets or medically equals the Listing 14.02 (Tr. 135). Additionally, the Appeals Council instructed the ALJ to, if necessary, obtain additional evidence from a medical expert to determine whether Plaintiff's impairment meets or medically equals one of a list of specific impairments outlined in the regulations. *See* 20 C.F.R. § 404.1520. (Tr. 136).

The regulations define lupus as involving "one of the organs/body systems...to at least a moderate level of severity; and...at least two constitutional symptoms or signs

(severe fatigue, fever, malaise, or involuntary weight loss)."[9]   As Plaintiff argued, "fatigue is the most common symptom negatively affecting the quality of life of people with" lupus (Doc. 27, p. 4).[10]   The ALJ determined that the medical evidence in the record was "sufficiently clear [to support] that a medical expert's testimony is not required to determine if the claimant's impairments met or equaled any listing. The evidence is far from supporting a finding that such an evaluation is necessary" (Tr. 27). Therefore, the ALJ based her disability determination on the record as it was submitted by Plaintiff during her first application for benefits and without additional medical information.

With this background in mind, Plaintiff's main argument is that the ALJ did not properly develop the RFC to account for her lupus diagnosis. The RFC is a measure of what an individual can do despite her limitations. *Young v. Barnhart*, 362 F.3d 995, 1000–01 (7th Cir. 2004); 20 C.F.R. §§ 404.1545(a), 416.945(a). The determination of a claimant's RFC is a legal decision rather than a medical one. *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995); *see also Thomas v. Colvin*, 745 F.3d 802, 808 (7th Cir. 2014). "RFC is an assessment

---

[9]  The full description in the regulation is as follows: "14:02 Systemic lupus erythematosus. As described in 14.00D1. With: A) Involvement of two or more organs/body systems, with: 1) One of the organs/body systems involved to at least a moderate level of severity; and 2) At least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss). OR B) Repeated manifestations of SLE, with at least two of the constitutional symptoms or signs (severe fatigue, fever, malaise, or involuntary weight loss) and one of the following at the marked level: 1) Limitation of activities of daily living. 2) Limitation in maintaining social functioning. 3) Limitation in completing tasks in a timely manner due to deficiencies in concentration, persistence, or pace." *See* SOCIAL SECURITY: MEDICAL/PROFESSIONAL RELATIONS, *Disability Evaluation Under Social Security* 14.00 Immune System Disorders—Adult, found at https://www.ssa.gov/disability/professionals/bluebook/14.00-Immune-Adult.htm#14_02 (last visited March 15, 2022).

[10]  Plaintiff cited to a CDC website that outlines the symptoms of lupus. *See* CENTERS FOR DISEASE CONTROL AND PREVENTION, *Systemic Lupus Erythematosus (SLE)*, available at https://www.cdc.gov/lupus/facts/detailed.html (last visited March 15, 2022).

of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. A 'regular and continuing' basis means 8 hours a day, for 5 days a week, or an equivalent work schedule." SSR 96-8p, 1996 WL 374184, at *1 (July 2, 1996). "The RFC assessment is a function-by-function assessment based upon all of the relevant evidence of an individual's ability to do work-related activities." *Id.* at *3.

In forming an RFC, "an ALJ must consider the entire record, but the ALJ is not required to rely entirely on a particular physician's opinion....." *Nichole M. S. v. Saul*, No. 19 C 7798, 2021 WL 534670, at *2 (N.D. Ill. Feb. 12, 2021), quoting *Schmidt v. Astrue*, 496 F.3d 833, 845 (7th Cir. 2007). "When an ALJ denies benefits, he must build an accurate and logical bridge from the evidence to [his] conclusion, and he may not play doctor by using his own lay opinions to fill evidentiary gaps in the record.' *Chase v. Astrue*, 458 F. App'x 553, 556-57 (7th Cir. 2012) (internal quotation marks and citations omitted); *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir. 1996) ("[A]s this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings."). To support the RFC assessment, an ALJ "must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 352 (7th Cir. 2005).

Plaintiff's first supporting argument that the ALJ did not develop the RFC is that the ALJ improperly relied on outdated state agency evaluations that took place prior to Plaintiff's lupus diagnosis. As outlined below, the Court is not convinced that the ALJ improperly relied on Drs. Threlkeld and Pardo's evaluations, as the ALJ also relied upon

the medical record as a whole, so Plaintiff's argument does not hold water. With that said, after reviewing the medical records and the ALJ's conclusion, the Court is convinced that the ALJ improperly cherry picked medical evidence from the record to support her findings.

Turning to the ALJ's decision, the ALJ conducted the hearing on July 23, 2019 based on a disability that Plaintiff alleged started on or around August 31, 2015 (Tr. 21). The ALJ determined that Plaintiff had severe impairments, including fibromyalgia, lupus, obesity, and bursitis of the right shoulder (Tr. 23). The ALJ found that while Plaintiff testified that her lupus severely impacted her, the evidence overall did not support the severity of her alleged functional limitations (Tr. 26). With this in mind, the ALJ determined that Plaintiff could perform light work with modifications as outlined in the RFC (Tr. 27-28).

The ALJ pointed to particular portions of the record that indicate Plaintiff did not have significant muscle weakness, mobility issues, or limitations in social functioning and completing tasks (Tr. 25-26). The majority of the support relied on by the ALJ in this section are medical records from Plaintiff's visits to her own doctors starting from around July 23, 2015 up until about July 27, 2018, and not the 2015 reports of Dr. Threlkeld and Dr. Pardo (Tr. 425; 975). The ALJ cites to seventeen different medical records of Plaintiff's visits to her rheumatologist, Dr. Rosenberg, of which fifteen mention Plaintiff's lupus diagnosis, as they document appointments after her August 3, 2016 diagnosis and up through July 27, 2018 (*See e.g.,* Tr. 652, noting Plaintiff has been diagnosed with lupus as of August 3, 2016; Tr. 656 (7F/13), 664 (7F/21), 671 (7F/28), 679 (7F/26), 685 (7F/42), 690

(7F/47), 696 (7F/53), 706 (7F/58), 725 (8F/22), 897 (16F/48), 933 (16F/84), 953 (16F/104),

975 (16F/127), all of which document Plaintiff's lupus diagnosis). Because the ALJ cited

to multiple portions of the record, and did not heavily rely on Drs. Threlkeld and Pardo's

opinions, Plaintiff's first supporting argument is not successful. But as noted above, the

Court has identified issues with the ALJ's interpretation of the medical information.

On review, the ALJ's decision must be affirmed if it is supported by substantial

evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing

for substantial evidence. *Burmester,* 920 F.3d at 510; *Shideler v. Astrue*, 688 F.3d 306, 310

(7th Cir. 2012). At first blush, it appears the ALJ considered Plaintiff's lupus diagnosis

appropriately, as she cited portions of the record including her medical records that

explain Plaintiff's diagnosis of lupus each time she sought treatment from Dr. Rosenberg.

The ALJ ultimately determined, based on the record, that Dr. Rosenberg's treatment of

Plaintiff's lupus was "conservative" and, therefore, Plaintiff's RFC was appropriate and

consistent with the record overall (Tr. 30). However, the ALJ misconstrued and ignored

pertinent medical evidence in drawing that conclusion. Additionally, as Plaintiff argues,

the Court is convinced that without additional medical information, it was improper for

the ALJ to determine that this course of treatment was "conservative."

As to the first issue, the Seventh Circuit has "repeatedly held that although an ALJ

does not need to discuss every piece of evidence in the record, the ALJ may not analyze

only the evidence supporting her ultimate conclusion while ignoring the evidence that

undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). A careful review of

the record shows that the ALJ ignored significant portions of the record directly related

to Plaintiff's lupus diagnosis. The ALJ points to portions of Plaintiff's medical records that indicate that her pain symptoms are managed through medications with reported improvements (Tr. 30, citing to 1F/10, 7F/19). When the Court examines the portions of the record the ALJ cites to in order to determine that Plaintiff has been given a "conservative" treatment plan that has shown that her "pain symptoms appear adequately managed through medication with reported improvements," the Court finds otherwise (Tr. 30). For example, the ALJ cites to a doctor's note from Dr. Rosenberg from August 3, 2016 in which Plaintiff describes that she experiences "fatigue always," but that she did not explain any other medication side effects (Tr. 650). Dr. Rosenberg records that Plaintiff is on 600 mg of Gabapentin[11] and also on Tramadol[12] (Tr. 650). While the next medical record cited to by the ALJ also indicates that Plaintiff reported no drug side effects, it also includes that Plaintiff's medication list changed, with Dr. Rosenberg prescribing Plaquenil (200 mg tablet)[13] and prednisone (5 mg tablet)[14] (Tr. 662-663).

---

[11] Gabapentin works in the brain to prevent seizures and relieve pain for certain conditions in the nervous system. It is not used for routine pain caused by minor injuries or arthritis, and is only available with a doctor's prescription. *See* MAYO CLINIC, *Gabapentin (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/gabapentin-oral-route/description/drg-20064011 (last visited March 15, 2022).

[12] Tramadol is used to relieve moderate to moderately severe pain, including pain after surgery. The extended-release capsules or tablets are used for chronic ongoing pain. It also acts in the central nervous system to relieve pain. *See* MAYO CLINIC, *Tramadol (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/tramadol-oral-route/description/drg-20068050 (last visited March 15, 2022).

[13] Plaquenil, also known as hydroxychloroquine, is from a family of medicines called "antimalarials." While this drug was originally used to prevent and treat malaria, it is now used to treat lupus and has been shown to decrease the number of disease flares and decrease the damage from the disease over time. *See* LUPUS FOUNDATION OF AMERICA, *Hydroxychloroquine (Plaquenil)*, https://www.lupus.org/resources/drug-spotlight-on-hydroxychloroquine (last visited March 15, 2022).

[14] Prednisone provides relief for inflamed areas of the body and is used to treat a variety of conditions, including arthritis, asthma, and lupus. *See* MAYO CLINIC, *Prednisone (Oral Route)*,

Plaintiff reported that her pain level at this time was 4/10 on this November 18, 2016 exam date (Tr. 662). She described that her fatigue was "no better" and she is "usually done by 11am" (Tr. 663). Dr. Rosenberg notes that Plaintiff's lupus is "poorly controlled," and she is experiencing "chronic pain," so he changed her medications to include an additional one for GERD[15] (Tr. 665).

    A few months later, on January 18, 2017, Dr. Rosenberg again changed Plaintiff's medications to include meloxicam [16], sumatriptan [17], pantoprazole [18], methotrexate sodium [19], tuberculin-allergy syringes for triamcinolone acetonide injections [20], while

---

https://www.mayoclinic.org/drugs-supplements/prednisone-oral-route/side-effects/drg-20075269?p=1 (last visited March 15, 2022).

[15] GERD, also known as Gastroesophageal reflux disease, occurs when stomach acid frequently flows back into the tube connecting your mouth and stomach. *See* MAYO CLINIC, *Gastroesophageal reflux disease (GERD)*, https://www.mayoclinic.org/diseases-conditions/gerd/symptoms-causes/syc-20361940 (last visited March 15, 2022).

[16] Meloxicam is a nonsteroidal anti-inflammatory drug (NSAID) used to relieve the symptoms of arthritis, such as inflammation, swelling, stiffness, and joint pain. *See* MAYO CLINIC, *Meloxicam (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/meloxicam-oral-route/description/drg-20066928 (last visited March 15, 2022).

[17] Sumatriptan is used to treat acute migraine headaches in adults. It works in the brain to relieve pain from migraine headaches. *See* MAYO CLINIC, *Sumatriptan(Oral Route)*, https://www.mayoclinic.org/drugs-supplements/sumatriptan-oral-route/description/drg-20074356 (last visited March 15, 2022).

[18] Pantoprazole is used to treat certain conditions in which there is too much acid in the stomach. *See* MAYO CLINIC, *Pantoprazole (Oral Route)*, https://www.mayoclinic.org/drugs-supplements/pantoprazole-oral-route/description/drg-20071434 (last visited March 15, 2022).

[19] Methotrexate is sued to treat a variety of ailments, including non-Hodgkin lymphoma, arthritis, psoriasis, and lupus. It blocks an enzyme that is needed by cells to live and this interferes with the growth of cancer cells (for cancer patients). That allows the body to destroy the cancer. *See* MAYO CLINIC, *Methotrexate (Oral Route),* https://www.mayoclinic.org/drugs-supplements/methotrexate-oral-route/description/drg-20084837 (last visited March 15, 2022).

[20] Triamcinolone injection is used to treat inflammation and allergic reactions, like certain types of skin diseases and/or arthritis. *See* MAYO CLINIC, *Triamcinolone (Injection Route),*

keeping Plaintiff on both Plaquenil and prednisone (Tr. 668-671)[21]. While the ALJ cited to the portion of this medical visit note in which Plaintiff reported her pain at a 4/10, Dr. Rosenberg's notes, yet again, indicate later on in the visit note that Plaintiff has "poorly controlled" lupus and "chronic pain" (Tr. 671). The ALJ points to sections of Plaintiff's medical records which show she also has a medical marijuana card and receives injections for her ailments (Tr. 698-99). The last medical note the ALJ cites to in support of her contention that Plaintiff has a "conservative" treatment plan that is managing her symptoms is from Plaintiff's September 27, 2018 visit to Dr. Rosenberg, in which he noted that Plaintiff's lupus is "poorly controlled," and that she is experiencing "right hip pain" (Tr. 976). While Plaintiff reported a "0" for muscle tenderness and weakness, there is nothing in the record to indicate if Plaintiff's lupus only manifests in muscle tenderness and weakness (*Id.*). Plaintiff's list of medications show that she is being prescribed additional medications, including meloxicam and belimumab, which are unaccounted for in the ALJ's decision (Tr. 982).

"Social Security proceedings are inquisitorial rather than adversarial.  It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits [internal citation omitted]."   *Sims v. Apfel*, 120 S. Ct. 2080, 2085 (2000). An ALJ is not required to discuss every piece of evidence in the record, but, at the same

---

https://www.mayoclinic.org/drugs-supplements/triamcinolone-injection-route/description/drg-20074674 (last visited March 15, 2022).

[21] Plaintiff also argues that she was put on additional medications, including Benlysta, but fails to cite to the portion of the record in which that is recorded (Doc. 27, p. 8).

time, the ALJ "may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore*, 743 F.3d at 1123, collecting cases. That is what the ALJ did here. The ALJ improperly determined that Plaintiff's course of medical treatment was "conservative," but only pointed to portions of the record that supported that conclusion, while ignoring portions of the record that could show Plaintiff's treatment was actually increasing in intensity and ignored recorded issues of fatigue, which is a major symptom of lupus, in developing her RFC. The ALJ "cannot simply cherry-pick facts supporting a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). "If the Commissioner commits an error of law," remand is warranted "without regard to the volume of evidence in support of the factual findings." *White ex rel. Smith v. Apfel*, 167 F.3d 369, 373 (7th Cir. 1999) (citing *Binion v. Chater*, 108 F.3d 780, 782 (7th Cir. 1997)).

Plaintiff's second argument is related, in that she argues the ALJ was required to seek out additional medical information related to Plaintiff's lupus as she was diagnosed with lupus after filing her application for disability benefits and after Drs. Threlkeld and Pardo reviewed her records. The Court agrees that the ALJ should have sought out additional medical information, but the analysis is not based in the timing of evidence, as implied by Plaintiff. Rather, the Court must look to the overall quality of the medical information before the ALJ.

It is well established that "an ALJ may not 'play[ ] doctor' and interpret 'new and potentially decisive medical evidence' without medical scrutiny." *Randall R. L. v. Comm'r of Soc. Sec.*, No. 1:19-CV-141-MGG, 2021 WL 717529, at *3 (N.D. Ind. Feb. 23, 2021)

*McHenry v. Berryhill*, 911 F.3d 866, 871 (7th Cir. 2018) (alteration in original) (quoting *Goins v. Colvin*, 764 F.3d 677, 680 (7th Cir. 2014)); *see also Moon v. Colvin*, 763 F.3d 718, 722 (7th Cir. 2014); *Akin v. Berryhill*, 887 F.3d 314, 317–18 (7th Cir. 2018); *Whitney v. Schweiker*, 695 F.2d 784, 788 (7th Cir. 1982). Here, it appears the ALJ did just that in assessing Plaintiff's lupus without an expert opinion and only with the opinion of state agency consultants, who did not have access to Plaintiff's medical records with her lupus diagnosis. The general rule is that an ALJ errs in accepting a reviewing doctor's opinion where the reviewer did not have access to later medical evidence containing "significant, new, and potentially decisive findings" that could "reasonably change the reviewing physician's opinion." *Stage v. Colvin*, 812 F.3d 1121 (7th Cir. 2016). The Court wishes to make it clear that "[n]ot all new evidence" following the state agency consultants' opinions will require a remand. *Jill A. W. v. Kijakazi*, No. 20 C 3854, 2022 WL 225879, at *10 (N.D. Ill. Jan. 26, 2022) (quoting   *Kemplen v. Saul*, 844 F. App'x 883, 887 (7th Cir. 2021). And this is what the Court means by the analysis not being based in timing of the information or whether the information before the ALJ is old; rather, the relevant question before the Court is "whether the new information 'changed the picture so much that the ALJ erred by continuing to rely on an outdated assessment by a non-examining physician and by evaluating himself the significance of the subsequent report.'" *Id.* (citation omitted). The cases leading up to *Kemplen* are helpful in illustrating the big picture. In *Stage*, new evidence indicated, for the first time, that the plaintiff needed a knee replacement. *Stage v. Colvin*, 812 F.3d 1121 (7th Cir. 2016). In *Moreno,* the new evidence consisted of a treating psychologist's office notes which documented

"significant and new developments" in plaintiff's mental health. *Moreno v. Berryhill*, 882 F.3d 722, 728 (7th Cir. 2018). *See also Lambert v. Berryhill*, 896 F.3d 768, 776 (7th Cir. 2018)(new evidence included failed surgical attempts to treat the plaintiff's pain and an opinion by the treating neurosurgeon that the plaintiff's condition had deteriorated and he was no longer capable of sedentary work). Here, Plaintiff argues, generally, that the new information would be her lupus diagnosis. The Court is not convinced by general arguments like this, but even so, a close review of the record indicates that there are issues with the ALJ's interpretation of the medical information that was before her.

"An ALJ need recontact medical sources only when the evidence received is inadequate to determine whether the claimant is disabled." *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). Here, the ALJ required additional information to determine that Plaintiff's course of treatment was, in fact, conservative. And the law is clear that "ALJs must rely on expert opinions instead of determining the significance of particular medical findings themselves." *Crystal D. H. v. Comm'r of Soc. Sec.*, No. 20-CV-742-RJD, 2022 WL 488142, at *4 (S.D. Ill. Feb. 17, 2022) (citing *Lambert v. Berryhill*, 896 F.3d 768, 774 (7th Cir. 2018)). It is unclear why the ALJ determined that Plaintiff's pain levels were more important to determine her disability status, as opposed to her fatigue levels, and why the ALJ determined that her treatment plan was conversative. An ALJ's decision must be supported by substantial evidence, and the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009) (internal citations omitted). That logical bridge is missing here. As such, remand is proper so that the ALJ can seek an updated medical

opinion. *See Green v. Apfel*, 204 F.3d 780, 782 (7th Cir. 2000) ("The ALJ had many options to avoid this error; for example, he could have sought an updated medical opinion").

The Court wishes to stress that this Memorandum and Order should not be construed as an indication that the Court believes that plaintiff was disabled during the relevant period or that she should be awarded benefits.   On the contrary, the Court has not formed any opinions in that regard and leaves those issues to be determined by the Commissioner after further proceedings.

### Conclusion

The Commissioner's final decision denying Plaintiff's application for social security disability benefits is **REVERSED** and **REMANDED** to the Commissioner for rehearing and reconsideration of the evidence, pursuant to sentence four of 42 U.S.C. §405(g).

The Clerk of Court is directed to enter judgment in favor of Plaintiff.

**IT IS SO ORDERED.**
**DATED: March 17, 2022**

s/ Mark A. Beatty
**MARK A. BEATTY**
**United States Magistrate Judge**